UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY CHAVEZ,

       Plaintiff,

Case No. 09-12336

v.

HON. SEAN F. COX
United States District Judge

WATERFORD SCHOOL DISTRICT,

       Defendant.

_____/

OPINION & ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [Doc. No. 27]

Plaintiff Amy Chavez ("Chavez") filed this action on June 16, 2009, alleging that she is

disabled, and that her employer, the Waterford School District ("the District") refused to provide

accommodations for her disabilities. On March 12, 2010, the District filed the instant motion for

summary judgment [Doc. No. 27]. The parties have fully briefed the issues, and a hearing was

held on May 27, 2010. For the reasons that follow, the Court **GRANTS IN PART** the District's

motion [Doc. No. 27], **DISMISSES** Chavez' intentional infliction of emotional distress claim

[Count III], and **DENIES** the remainder of the District's motion.

BACKGROUND

Consistent with the requirements of FED. R. CIV. P. 56, the following are the relevant

facts of this matter, taken in the light most favorable to the non-moving party, Ms. Chavez.

Ms. Chavez was originally hired as a middle-school teacher with the District in 1999.

From the beginning of the 1999-2000 school year through the 2003-2004 school year, Ms.

Chavez taught seventh-grade math and social studies. Before the events leading to this lawsuit,

1

Ms. Chavez had not previously been disciplined by the District - in fact, she had received several commendations, including two "Above and Beyond" awards and the "Spirit of Pierce" award. [*See* Def.'s Ex. 6].

In 2004, Ms. Chavez was diagnosed with a brain tumor, which required several surgeries and necessitated her being placed on medical leave for the entire 2004-2005 school year. As a result of her surgeries, she suffered a paralyzed vocal cord. The damage to Ms. Chavez' vocal cord makes it difficult for her to speak at normal volume levels for extended periods of time.

On June 16, 2005 after having missed the entire 2004-2005 school year due to her medical issues, Ms. Chavez received a "welcome back" letter from the District. [*See* Def.'s Ex. 2, Doc. No. 27]. In that letter, Assistant Superintendent Peni F. Aldrich ("Aldrich") assigned Ms. Chavez to Pierce Middle School ("Pierce"), where she would be teaching seventh grade math and social studies. *Id*. However, upon reporting to work at Pierce on August 16, 2005, Ms. Chavez was informed by the Principal, Yvonne Dixon ("Dixon") that the school hadn't been informed of Ms. Chavez' assignment, and that there was no open position for her at that time. [Chavez Aff., Pl.'s Ex. 1, Doc. No. 32, ¶3]. Instead, Ms. Chavez was assigned as a "Building Substitute under WEA Contract," [*See* Def.'s Ex. 1, Doc. No. 27] - a position Ms. Chavez characterizes as a "permanent substitute." [Pl.'s Br., Doc. No. 32, p.2].

Due to her continued difficulty speaking at a raised volume for long periods of time, at the beginning of the 2005-2006 school year Ms. Chavez asked Ms. Dixon to provide her with a microphone to use in class. Ms. Chavez alleges that she made her request for a microphone on August 24, 2005, but that her request wasn't fulfilled until December of that year - and only then with "an old, outdated microphone from the warehouse." [Chavez Aff., ¶¶ 4-5]. Further, when

Ms. Chavez was moved to another classroom in January of 2006, Pierce did not relocate her microphone system for her. *Id.*

For the 2006-2007 school year, Ms. Chavez received a permanent position teaching five sections of seventh grade math. [Def.'s Ex. 1, Doc. No. 27]. Ms. Chavez reiterated her request for an adequate microphone in her classroom, and also began using a computer supplied by the District in her classroom teaching. [Chavez Aff., ¶6]. When the computer broke in February of 2007, however, Dixon informed Chavez that she would need to wait until the summer to submit a repair request. *Id.* at ¶7. After submitting that request to the District's tech department over the summer, Ms. Chavez returned to school for the 2007-2008 school year to find that her computer had still not been repaired. *Id.* at ¶¶7-8. Ms. Chavez continued teaching five sections of seventh grade math throughout the 2007-2008 school year. [Def.'s Ex. 1, Doc. No. 27].

Though not entirely clear from the record, it appears that a microphone was provided for Ms. Chavez' use in the 2007-2008 year. [*See* Aug. 18, 2008 Letter from Dr. Jodi Ganley, Pl.'s Ex. 3, Doc. No. 32 ("Certainly, Ms. Chavez is receiving benefit from the microphone and sound system that was set up for her last year")].

In July of 2008, Ms. Chavez met with Ms. Dixon and told her that teaching five sections of math was too strenuous on her voice. [Chavez Aff., ¶11]. Ms. Chavez' neurologist, Dr. Jodi Ganley, supported Ms. Chavez' request to teach less math through a letter to the District dated August 18, 2008. [*See* Pl.'s Ex. 3, Doc. No. 32]. Ms. Chavez preferred to divide her time between math and social studies - in large part because, according to Dr. Ganley's letter, teaching math required almost constant lecturing, while social studies did not. *Id.* This request was denied by the District, and Chavez again was scheduled for a full day of math instruction.

[Def.'s Ex. 1, Doc. No. 27].

When she arrived at Pierce at the beginning of the 2008-2009 school year, Ms. Chavez found that her computer problems had still not been resolved by the District. It was only on October 13, 2008 that her computer was finally taken for repair, and replaced temporarily with a much slower computer which did not have printing capabilities - which Ms. Chavez contends made it much harder for her to overcome the limitations of her disability and teach effectively. [Chavez Aff., ¶¶13-14].

Ms. Chavez contends that, prior to her surgery, she had only been observed by a principal in the classroom setting as part of the District's tenure program evaluations - and in those instances the evaluations had all come with prior notice, and had resulted in satisfactory findings. *Id*. at ¶10. Ms. Dixon made a single, unannounced, classroom visit and observation of Ms. Chavez' teaching on October 13, 2007 - after Ms. Chavez first began making requests for reasonable accommodation of her disability. *Id*. at ¶9. In the fall of 2008, however, Ms. Dixon began making more frequent unannounced visits to observe Ms. Chavez' teaching, with Ms. Chavez alleging that the visits occurred "[t]hroughout September of 2008." These observations led to Ms. Dixon informing Ms. Chavez - on October 15, 2008 - that students were not effectively learning in Ms. Chavez' classes and that Ms. Dixon would be spending more time in her classes. *Id*. at ¶16.

Shortly thereafter - Ms. Chavez claims as a result of the stress from teaching five math courses, combined with the stress she claims she felt from Ms. Dixon's evaluations and from the District's failures to provide her with appropriate technology [Pl.'s Br., Doc. No. 32, p.3], on November 3, 2008 Dr. Ganley advised Ms. Chavez to reduce her work to half-days until further

notice. [*See* Pl.'s Ex. 4, Doc. No. 32]. That request was denied by the District the next day -

November 4, 2008. [Chavez Aff., ¶19]. On advice of both her doctor and her union

representative, Ms. Chavez took medical leave until her reasonable accommodation requests

could be accommodated. *Id*. at ¶20.

During this time period, two of Ms. Chavez' doctors provided letters to the District.

Specifically, Ms. Chavez' primary care physician, Dr. Bradford Woelke, wrote Assistant

Superintendent Aldrich on November 7, 2008. [*See* Def.'s Ex. 30, Doc. No. 27]. In that letter,

though Dr. Woelke stated that, though Ms. Chavez would require accommodations from the

District, she was "mentally and physically capable of performing all of the requirements of her

position." *Id*. Dr. Woelke also informed the District that, pursuant to the ADA, Ms. Chavez

would require the following:

- A teaching assignment with no more than one hour a day teaching Math
- A projector connected to a computer to assist her in classroom communication
- A microphone
- Frequent bathroom breaks

*Id*. These findings were echoed by Ms. Chavez' neurologist - Dr. Ganley - in a letter addressed

to the District dated November 5, 2008. [*See* Def.'s Ex. 31, Doc. No. 27].

In response, Assistant Superintendent Aldrich sent Ms. Chavez a memo - copied to Ms.

Dixon - on November 11, 2008. [*See* Def.'s Ex. 3]. In that memo, Alrich rejected Ms. Chavez'

request to teach a combined course load of both math and social studies courses. Instead, the

District states as follows:

> You will teach only 1 class, first hour of the day. You will continue with your
> same students and the same classroom as requested on November 7, 2008. We
> will adjust your teaching assignment accordingly from 1.0 to .2. The School
> District does not customarily utilize less than fulltime teaching positions and this

situation will be reviewed no later than the end of the school year. We hope that you will be able to perform the duties and responsibilities of a fulltime teaching position and expect to so assign you no later than the start of the 2009-2010 school year.

[Def.'s Ex. 3, Doc. No. 27].

Ms. Chavez filed a complaint against the District with the Equal Employment Opportunity Commission ("EEOC") on January 20, 2009. [Chavez Aff., ¶1]. It is undisputed that Ms. Chavez was not assisted by counsel in the preparation of that complaint - nor is it disputed that Ms. Chavez neglected to check the box on the EEOC's complaint form indicating that the District had retaliated against her.

In advance of her return to work in the spring of 2009, Ms. Chavez met with the District to discuss reasonable accommodations. At that meeting, held on February 25, 2009, Ms. Chavez alleges that it was agreed that the District would provide a microphone with a mouthpiece, a projector connected to a printer, frequent bathroom breaks to clear mucous from her throat, and that Ms. Chavez could tape some of her lectures using a camcorder supplied by the school library at Pierce. [Chavez Aff., ¶21]. These arrangements, Ms. Chavez contends, were confirmed by the District on March 9, 2009 and again on March 13, 2009. *Id*. at ¶¶22-23. Despite these assurances, Ms. Chavez alleges that, when she returned on March 18, 2009, the microphone system the District had put into her classroom had dead spots, she had not been provided with a cable to connect her computer to the projector, and the projector itself wouldn't function properly due to a dim bulb. *Id*. at ¶ 24. When she asked the library about replacing the bulb in her projector, Ms. Chavez was informed that Ms. Dixon had said the bulb would have to do until it had completely burned out. *Id*. at ¶25.

Ms. Chavez took another medical leave from April 2, 2009 until May 11, 2009. During

this time period, Ms. Chavez was again assured that the technological equipment she requested would be available and in good working order upon her return. *Id*. at ¶¶26-27. Upon her arrival at work on May 11, 2009, however, Ms. Chavez found that nothing had been done to fix her microphone issues, and that only one cable had been supplied to connect her computer to the two projectors. *Id*. at ¶28.

In May of 2009, Ms. Dixon again resumed her unannounced observations of Ms. Chavez' classroom teaching sessions - and now also required Ms. Chavez to submit lesson plans for her prior approval before Ms. Chavez could present the material to her students. *Id*. at ¶¶29, 31. Specifically, Ms. Chavez alleges that Ms. Dixon attended her lectures on May 18, May 26, May 27, and May 28, 2009.

Also on May 28, 2009, Ms. Chavez alleges that Ms. Dixon suggested the best way to solve the problem of dead microphone spots in her classroom was for Ms. Chavez to "tape the floor so I would know not to try to talk while standing in the dead spots." *Id*. at ¶34. The following day - May 29, 2009 - due to Ms. Chavez exhaustion, Dr. Woelke took her off work for a period of two weeks. In response, Ms. Chavez alleged that Ms. Dixon called her at home that day and told here that the District would require a psychiatrist's release in order for her to return to work - despite the fact that the disabilities Ms. Chavez complained of were not generally psychiatric in nature. *Id*. at ¶36.

That same date, the District sent Ms. Chavez a "Notice of Concern" questioning her fitness to teach seventh grade mathematics. [*See* Def.'s Ex. 29, Doc. No. 27]. Despite this "concern" for her teaching ability, on July 2, 2009 the District nonetheless assigned her not only to teach five courses of seventh grade mathematics in the upcoming 2009-2010 academic year,

but further slated her to teach pre-algebra - a more advanced course.

Fed up with waiting for the District to adequately fulfill her reasonable accommodation requests for added technology, Ms. Chavez began to take matters into her own hand during the summer of 2009. To prepare for the Fall 2009 semester, Ms. Chavez alleges that she contacted Ms. Dixon on June 23, 2009 to ensure that the laptop computer she intended to purchase would interface with her classroom's LCD projector. In response, Ms. Dixon allegedly told her that the equipment was in storage for the summer. However, when Ms. Chavez arrived at Pierce in September of 2009, Ms. Dixon allegedly told her that Ms. Chavez should have spoken with her first before purchasing equipment on her own. *Id*. at ¶39.

Ms. Chavez also spent her own money on a sound system that could effectively be heard throughout her classroom, only to have Ms. Dixon come to her classroom on September 3, 2009 and inform her that the laptop and microphone system could not used in the school's classroom. *Id*. at ¶41. When confronted about how the school's wire microphone headset pushed on Ms. Chavez' brain surgery scar, Ms. Dixon allegedly told Ms. Chavez to tape a cushion to it. *Id*. Further confounding matters, a computer tech from the District met with Chavez on September 4, 2009, and stated that there was no reason Ms. Chavez' personal equipment could not be used in her classroom. *Id*. at ¶44.

In September of 2009, Ms. Dixon again resumed her unannounced observations of Ms. Chavez' teaching sessions - specifically, Ms. Chavez alleges that Ms. Dixon observed her classes on September 14, September 15, and multiple times on September 26, 2009. *Id*. at ¶49.

Ms. Chavez' last day working for the District was September 29, 2009, and in October of 2009 Ms. Chavez applied for long-term disability benefits. *Id*. at ¶¶50-51.

Ms. Chavez filed her original Complaint [Doc. No. 1] in this action on June 16, 2009 -
before she ultimately resigned from employment with the District. On January 18, 2010, Ms.
Chavez filed her First Amended Complaint ("Complaint"), alleging causes of action under the
Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. [Count I], Michigan's Persons with
Disabilities Civil Rights Act, M.C.L. § 37.1201 *et seq*. [Count II], and for intentional infliction
of emotional distress [Count III]. In the instant motion for summary judgment [Doc. No. 27], the
District argues for dismissal of all Ms. Chavez' claims. Ms. Chavez opposes the motion.

## STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgement as a
matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment has the initial
burden of informing the court of the basis for its motion and identifying those portions of the
pleadings, depositions, answers to interrogatories, and admissions on file together with the
affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex
v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must
set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

## ANALYSIS

In its motion for summary judgment [Doc. No. 27], the District argues that this Court
lacks subject matter jurisdiction over Ms. Chavez' ADA claim, and that Ms. Chavez' ADA,
PWDCRA, and intentional infliction of emotional distress claims fail as a matter of law. For the

reasons that follow, the Court **HOLDS** that Ms. Chavez' claim for intentional infliction of emotional distress [Count III] fails as a matter of law, and therefore **GRANTS** the District's motion for summary judgment on that count.  As the District's subject matter jurisdiction argument fails as a matter of law, however, and as genuine issues of material fact remain regarding Ms. Chavez' ADA and PWDCRA claims, the Court **DENIES** the remainder of the District's motion.

    I.  <u>Subject Matter Jurisdiction Over Ms. Chavez' ADA Claims</u>.

The District Court argues that this Court lacks subject matter jurisdiction over Ms. Chavez' ADA claims because: 1) Ms. Chavez' "immediate request for a Right to Sue letter" constitutes a failure to exhaust administrative remedies; and 2) Ms. Chavez did not "check the box" on her EEOC filing claiming that she had been retaliated against.  [*See* Def.'s Br., Doc. No. 27, pp.4-5].  The Court find both of these arguments without merit.

    A.  Immediate Request for a Right to Sue Letter.

Before filing a lawsuit in federal court, an ADA plaintiff must exhaust his or her administrative remedies by filing a charge of discrimination with the EEOC.  *See* 42 U.S.C. § 12117(a); *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000).  In this case, when Ms. Chavez filed a discrimination charge with the EEOC on January 20, 2009, she concurrently requested a Right to Sue letter.  Relying upon an unpublished decision from the Western District of Michigan, the District argues that "Plaintiff's immediate request for a Right to Sue letter would constitute a failure to exhaust administrative remedies." [Def.'s Br., Doc. No. 27, p.4, citing *White v. Northern Mich. Regional Hosp.*, 2010 WL 549312, *3 (W.D. Mich. Feb. 10, 2010)].  In particular, the District relies primarily upon the following quote from *White* in

support of its arguments:

> The administrative remedies which White short-circuited are part of a carefully designed, integrated framework which combines investigation, conference and conciliation, and lastly - only if it is unavoidable, *after* the other processes have been fully tried - litigation.  Aggrieved persons cannot pick and choose which components of the system they will allow to operate.

*White*, 2010 WL 549312, *3 (emphasis in original).

As Ms. Chavez argues, however, *White* is not controlling of the issues in this matter.  In *White*, the plaintiff filed a discrimination charge, and then *withdrew the charge two months later to pursue her case in court*.  *White*, 2010 WL 549312, *2.  "In this case, Chavez never stated that she was withdrawing her EEOC complaint, nor did she indicate that she would not participate in an EEOC investigation.  Rather, she did precisely as she was supposed to - she filed the EEOC complaint, and also requested a 'Right to Sue' letter."  [Pl.'s Br., Doc. No. 32, pp.12-13].  The Court agrees, and finds no authority in *White* supporting the District's argument that requesting a "Right to Sue" letter concurrent with an EEOC discrimination charge constitutes a failure to exhaust administrative remedies.  The District's arguments to the contrary are without merit.

B.  Failure to "Check the Box" on Ms. Chavez's EEOC Charge.

It is undisputed that, upon filing her discrimination claim with the EEOC, Ms. Chavez did not check the box on the EEOC's form indicating that she had been retaliated against by the District.  The District argues that this omission bars Ms. Chavez from asserting an ADA retaliation claim:

> Plaintiff did not check the box indicating that she had experienced retaliation, nor does Plaintiff make any reference to retaliation in the body of her complaint.  Plaintiff is therefore barred from asserting this claim, and Plaintiff's retaliation claim must be dismissed.

[Def.'s Br., Doc. No. 27, p.5].

The Court disagrees.  It is undisputed that Ms. Chavez was *not* assisted by counsel in the filing of her discrimination charge with the EEOC.  While the Sixth Circuit has cautioned that retaliation claims must ordinarily be included on a plaintiff's EEOC charge, courts are to liberally construe the EEOC charge where, as here, a *pro se* litigant files the charge:

> In the case of a retaliation claim not included in an EEOC charge, we have held that retaliation claims based on conduct that occurred before the filing of the EEOC charge must be included in that charge.  We have cautioned, however, that *an EEOC charge filed by lay complainants should be liberally construed*, because they are unschooled in the technicalities of the law and proceed without counsel.  Actions in federal court should not be restricted by the failure of a complainant to attach the correct legal conclusion to the EEOC claim, conform to procedural technicalities, or include the exact wording which might be required in a judicial pleading.  *Thus, where the claimant is unrepresented, a broader reading of the charge is compelled.*

*Tisdale v. Federal Express Corp.*, 415 F.3d 516, 527 (internal quotations and citations omitted) (emphasis added).  The *Tisdale* Court went on to hold that, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim."  *Id*. (internal quotations omitted).  Finally, noting its prior holding in *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828 (6th Cir. 1999), the *Tisdale* Court held as follows:

> We stated [in *Duggins*] that where the plaintiff alleged facts to the EEOC which clearly included retaliation allegations and where the plaintiff was not represented by legal counsel in writing her one-page EEOC charge, such a plaintiff should not be precluded from bringing a retaliation claim in the complaint.  We also noted that *retaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim foreseeable to the defendants.*

*Tisdale*, 415 F.3d at 527-28 (internal citations and quotations omitted) (emphasis added).

As in *Tisdale*, here Ms. Chavez prepared her EEOC discrimination charge without the assistance of counsel.  Like *Tisdale*, Ms. Chavez' EEOC charge related facts which include

retaliation allegations, and as *Tisdale* noted, such claims could foreseeably grow out of any substantive discrimination charge. As in *Tisdale*, therefore, the Court "decline[s] to penalize [Ms. Chavez] for failing to reach the correct legal conclusion on the EEOC charge." *Tisdale*, 415 F.3d at 528. The District's arguments to the contrary are without merit.

II. Ms. Chavez' "Qualified" Status Under the ADA and the PWDCRA.

In Counts I and II of her First Amended Complaint, Ms. Chavez alleges causes of action under both the ADA and the PWDCRA for the District's alleged failure to accommodate her disabilities. In arguing for summary judgment on these causes of action, the District argues that "there is no genuine issue of material fact that Plaintiff is <u>unable</u> to perform the essential functions of her job, with or without reasonable accommodations." [Def.'s Br., Doc. No. 27, p.11 (emphasis in original)]. The Court disagrees.

The Sixth Circuit has held that the ADA and PWDCRA "substantially mirror" each other. *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 597 (6th Cir. 2002). "Therefore, resolving the ADA claim will generally resolve the PWDCRA claim as well." [Pl.'s Br., Doc. No. 32, p.18, quoting *Cotter*, 287 F.3d at 597]. Therefore, the Court will consider the District's concurrent arguments under the ADA and the PWDCRA in tandem.

Under the ADA, plaintiffs may prove their cases through either direct or indirect evidence. *Monette v. Elec. Data Systems Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). In cases involving indirect evidence, the plaintiff must establish a prima facie case of discrimination by showing that: 1) he or she is disabled; 2) *otherwise qualified for the position, with or without reasonable accommodation*; 3) that he or she suffered an adverse employment decision; 4) that the employer knew or had reason to know of the plaintiffs' disability; and 5) the position

13

remained open while the employer sought other applicants or the disabled individual was replaced. *Id.* at 1186-87. Here, the District argues that Ms. Chavez, because of her medical condition and because of her alleged teaching deficiencies, is not "otherwise qualified" for her position.

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Only a minimal showing of "qualification" is required to establish a prima facie claim; "a plaintiff need only to demonstrate that she possesses the basic skills necessary for performance of the job." *Sista v. CDC Ixis N.A., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) (internal citation and quotation omitted). The Sixth Circuit has held that inquiry into the "otherwise qualified" status of an employee is generally a question of fact for the jury:

> . . . And since it is part of the 'otherwise qualified' inquiry, our precedent requires that the reasonable accommodation question be decided as an issue of fact - meaning, of course, that it is one for the trial court or jury. . . .

*Doherty v. Southern College of Optometry*, 862 F.2d 570, 575 (6th Cir. 1988) (interpreting similar language in the federal Rehabilitation Act) (internal quotations omitted).

The District's arguments why the Court should find Ms. Chavez not "qualified" as a matter of law under the ADA or the PWDCRA fall into two distinct categories: 1) Ms. Chavez' medical condition; and 2) Ms. Chavez' allegedly deficient performance in the classroom. The Court will consider each in turn.

A. Ms. Chavez' Medical Condition.

In its brief in support of summary judgment, the District argues that Ms. Chavez'

medical condition renders her unqualified for teaching.  In support of this argument, the District primarily relies upon a report generated as a result of Ms. Chavez' July 16, 2009 visit to the Neuro-Oncology Clinic at the University of Michigan [Def.'s Ex. 11, Doc. No. 27].  The District argues that this report "found [Ms. Chavez] to have continuing medical conditions that directly prevent her from performing the essential functions of her job as a teacher in the Defendant District."  [Def.'s Br., Doc. No. 27, p.6].

Exhibit 11, however, does not support the District's arguments.  While the District cherry-picks phrases and statements from Exhibit 11 regarding how Plaintiff "is no longer able to multitask," "has difficulty thinking straight and concentrating on any one task very long due to anxiety," that she is "more forgetful," and had "difficulty performing math tests," [*See* Def.'s Ex. 11, Doc. No. 27, p.2], the document also notes that these symptoms occurred "[s]ince being on Keppra and Effexor" for anxiety issues, and that while Ms. Chavez believed these symptoms "may be related to stress at work," "she is still suspicious of her medications."  *Id*.

These suspicions were echoed *by her doctors*, who in the "Impression" section of the document noted that Ms. Chavez exhibits "[d]ecreased cognitive function, forgetfulness, and difficulty multitasking.  *It is possible the symptoms are related to her medication such as Keppra*."  *Id*. at 3 (emphasis added).

Nowhere in Defendant's Exhibit 11 do Ms. Chavez' doctors conclude that Ms. Chavez' medical condition renders her unqualified for her former position with the District.  Indeed, though the document specifically notes that Ms. Chavez was still employed as a teacher [*see* Ex. 11, Doc. No. 27, p.2], none of the recommendations by Ms. Chavez' doctors as a result of her July 16, 2009 visit include *any* restrictions on work.  *Id*. at pp.3-4.  The District's arguments to

the contrary regarding Exhibit 11 are without merit.

The District also relies upon evidence related to Ms. Chavez' ability to speak for long periods of time. Relying on a report dated September 10, 2009, the District argues that Ms. Chavez' voice "fatigues after 3 or 3 and ½ minutes of continuous talking[,] indicating there is still a limitation in how much she can use her voice." [Def.'s Ex. 12, Doc. No. 27, p.1]. However, this same document notes that the doctor writing the report "is discharging Amy Chavez from treatment activities," that she "shows some improvement in her voice," notes that Ms. Chavez "is making arrangements for a better amplification system in her classroom," and that the doctor is "comfortable discharging the patient from formal treatment activities."

The District further relies upon the progress notes of Dr. Rolnick dated August 31, 2009 [*See* Def.'s Ex. 15, Doc. No. 27], which also note that Ms. Chavez experiences voice fatigue after three minutes of talking. The document also states, however, that Ms. Chavez and Dr. Rolnick "worked on more vocal stamina drills in therapy and she did well." *Id*. Again, nowhere in Defendant's Exhibits 12 of 15 do the doctors make any statements regarding Ms. Chavez' qualifications to continue in her position with the District.

Finally, both in its briefing and at oral argument at the May 27, 2010 hearing, the District argued that Ms. Chavez' inability to speak for long periods of time at her January 18, 2010 deposition for this cause of action somehow demonstrates that Ms. Chavez was not qualified for her position with the District during her time of employment. [*See* Def.'s Br., Doc. No. 27, pp.7-8]. It is difficult to imagine how Ms. Chavez's voice on *one particular day*, almost *four months after leaving employment with the District*, and *without the aid of any of the reasonable accommodations* requested by Ms. Chavez for her teaching, has any relevance at all to this cause

16

of action.

The District's arguments regarding Ms. Chavez' application for long-term disability

benefits are similarly without merit.  [*See* Def.'s Br., Doc. No. 27, p.7 ("Further evidence of

Plaintiff's inability to perform a teaching position is her application for Long-Term Disability

benefits.")].  As Ms. Chavez argues:

> Chavez applied for these benefits as a direct result of the harassment she has
> experienced at the hands of [the District]. . . . Alternatively, even if Chavez'
> application for Long-Term disability is held to somehow demonstrate that she is
> not *currently* qualified for her position, a genuine issue of material fact still exists
> regarding the years of harassment and discrimination that [the District]
> perpetrated, from the time she first returned from medical leave to the time she
> became eligible for those benefits.

[Pl.'s Br., Doc. No. 32, p.16 (emphasis in original)].  The Court agrees, and find the District's

arguments to the contrary without merit.

At best, the District's arguments regarding Ms. Chavez' status as "qualified" under the

ADA and the PWDCRA generate genuine issues of material fact.  Summary judgment is

therefore improper, and the Court **DENIES** the District's motion with respect to Ms. Chavez'

medical condition rendering her "unqualified" for her position with the District.

### B. Ms. Chavez' Allegedly Deficient Performance on the Job.

The District also argues at length in its brief regarding Ms. Chavez's status as

"unqualified" for purposes of the ADA and the PWDCRA due to her allegedly deficient

performance in the classroom. [*See* Def.'s Br., Doc. No. 27, pp.8-11].  Citing high failure rates

for her students, allegedly improper teaching techniques, parent complaints, and District

employees' assessments of Ms. Chavez' teaching style, the District surmises in rather conclusory

fashion that this evidence supports its argument that Ms. Chavez was therefore "unqualified."

This argument misses the mark.  Even assuming, *arguendo*, that all of these allegations *are true* - a conclusion directly at odds with the requirement that the Court consider all disputed facts in the light most favorable to the party opposing the motion - the District offers *absolutely no authority* for its contention that poor job performance, in and of itself, can render one "unqualified" for his or her position for purposes of the ADA.  The Court therefore **DENIES** the District's motion with respect to Ms. Chavez' allegedly deficient job performance rendering her "unqualified" for her position with the District.

III. Ms. Chavez' Failure to Accommodate Claims Under the ADA and the PWDCRA.

As an alternative to its arguments regarding Ms. Chavez' "qualified" status under the ADA and the PWDCRA, the District further argues that Ms. Chavez' reasonable accommodation claims should be dismissed as Ms. Chavez "has no evidence that Defendant failed to provide the necessary accommodations."  [Def.'s Br., Doc. No. 27, p.12].  The Court disagrees.

As discussed *supra*, resolution of Ms. Chavez' ADA claims will also resolve her PWDCRA claims.  Under the ADA, an employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  The ADA defines "reasonable accommodation" to include:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition of modification of equipment or devices. . . [or] other similar modifications for individuals with disabilities.

42 U.S.C. § 12111(9)(B).

The Sixth Circuit has explained the requirements for an employer presented by a request for reasonable accommodation under the ADA as follows:

> A request for reasonable accommodation by an employee or her physician triggers the employer's statutory duty reasonably to accommodate the employee's

condition. The employer need not provide the accommodation that the employee requests or prefers. Instead, the employer retains the "ultimate discretion" to choose another effective accommodation, even if less expensive or easier to provide. *Hankins v. The Gap*, 84 F.3d 797, 800-01 (6th Cir. 1996). Accordingly, an employee is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided. *Ibid.*; 29 C.F.R. § 1630.9(d) (2001). To prevail, [a plaintiff] *must demonstrate a genuine issue of material fact with regard not only to her entitlement to a requested accommodation, but also to the inadequacy of the offered alternatives. See Gaines v. Runyon*, 107 F.3d 1171, 1178 (6th Cir. 1997).

*Trepka v. The Board of Ed. of the Cleveland School Dist.*, 28 Fed. Appx. 455, 459-60 (6th Cir.

Jan. 24, 2002) (emphasis added). As with a plaintiff's status as "qualified" under the ADA, the

question whether an employee has been reasonably accommodated is normally one of fact for

the jury. *See Smith*, 827 F.2d at 1985.

In her First Amended Complaint, Ms. Chavez alleges as follows:

20. The accommodations requested by Plaintiff and her physicians was the installation of a projector with a computer connection, a microphone with a mouthpiece, math curriculum student videos, frequent bathroom breaks to clear mucous from Plaintiff's throat, and reassignment to a schedule that would not include full days of math instruction.

21. After the passage of time, some requests were met and some continued to be denied to date. Many of the accommodations were half-heartedly addressed by Defendant with resolutions that do not work and Defendant has failed and refused to correct this.

[Pl.'s First Amended Complaint, Doc. No. 18, ¶¶20-21]. The District argues, however, that it

"has provided reasonable accommodations in response to all of Plaintiff's requests." [Def.'s Br.,

Doc. No. 27, p.13]. The District further argues as follows:

In this case, Plaintiff was provided with reasonable equipment to meet her requests for a microphone and a projector connected to a computer and with numerous scheduled bathroom breaks and an option for additional breaks to meet her request for frequent breaks. Plaintiff and Defendant had numerous meetings, e-mail exchanges and conversations with Plaintiff, during which they discussed the requested accommodations, proposed solutions, and did troubleshooting of any problems that had arisen from same.

*Id*. at 14.  All of this, however, is consistent with Ms. Chavez' allegations in Paragraphs 20 and

21 of her First Amended Complaint.  As Ms. Chavez summarizes in her brief:

> Chavez asked for the reasonable accommodation of having a computer and
> projectors in her room.  This request was met with a projector lit by a too-dim
> bulb, which Dixon refused to replace, one connecting cord when two were
> necessary for a functioning classroom, a microphone that was as bad as having
> none, and even refusal to allow use of real accommodations when Chavez brought
> them herself.  Additionally, she was consistently scheduled to teach a full day of
> math, even though she reasonably requested not to.  She reasonably requested
> extra bathroom breaks to clear her throat of mucous, and yet her relief did not
> show up.

[Pl.'s Br., Doc. No. 32, p.18].

These facts, viewed in the light most favorable to Ms. Chavez, demonstrate a genuine

issue of material fact whether the District made reasonable accommodations for Ms. Chavez'

disability.  Summary judgment on Ms. Chavez' reasonable accommodation claims under the

ADA and the PWDCRA is therefore improper, and the Court **DENIES** the District's motion

with respect to this argument.

IV.  Ms. Chavez' Constructive Discharge Claims Under the ADA and the PWDCRA.

In Counts I and II of her First Amended Complaint, Ms. Chavez alleges under both the

ADA and the PWDCRA that the District's failure to accommodate her disabilities led to Ms.

Chavez' constructive discharge.  In its motion for summary judgment, the District argues that the

Court should grant summary judgment on Ms. Chavez' constructive discharge claims.  The

Court disagrees.

Constructive discharge occurs when an employer, with discriminatory purpose, renders

the employee's working conditions so intolerable that the employee is forced to quit.  *Starks v.*

*New Par*, 1999 WL 357757, *5 (6th Cir. May 11, 1999).  In order to support a claim for

constructive discharge, however, there must first be an underlying cause of action for some type of employment discrimination. *See Moore v. Kuka Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Id.*

In a case with factual circumstances similar to those of this matter, the Sixth Circuit found genuine issues of material fact sufficient for an ADA plaintiff to survive summary judgment. In *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099 (6th Cir. 2009), the Sixth Circuit held that an employer's refusal to reasonably accommodate the plaintiff employee's medical requirements generated facts sufficient for the plaintiff's constructive discharge claim to survive summary judgment:

> Assuming that Talley was denied a reasonable accommodation that forced her to work in excess of her medical restrictions, a reasonable jury could infer that the defendants knew that Talley's working conditions would become intolerable to a reasonable person suffering from her particular disability.

*Talley*, 542 F.3d at 1109. While the *Talley* court was careful to avoid transforming *all* failure to accommodate claims into grounds for a potential claim for constructive discharge, *Talley* still held that, under circumstances similar to those in this case, a constructive discharge claim was still proper:

> We emphasize that our holding today does not pave the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate her disability. But *when an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered*, a jury may conclude that the employee's resignation was both intended and foreseeable.

*Id.* (emphasis added).

21

Ms. Chavez argues that "[t]he facts, as stated [in her other arguments in opposition to the District's motion] show that there is enough evidence for a jury to support a finding of constructive discharge." [Pl.'s Br., Doc. No. 32, p.21]. The Court agrees. Viewed in the light most favorable to Ms. Chavez, the evidence supports her claims that many of her requested accommodations - such as her request to teach less math courses - were denied outright. Some accommodations, like the projector and the microphone system, were originally met with solutions which were unworkable, and upon notice the District did little to remedy the problem. Some accommodations - like the District's willingness to supply additional staff to allow Ms. Chavez extra bathroom breaks - were allegedly more imagined than real. And in the face of Ms. Chavez' repeated requests for reasonable accommodations, the District engaged in conduct which, in the light most favorable to Ms. Chavez, could appear to jury as one-sided harassment through the District's disciplinary procedures and unannounced classroom observations. On these facts, Ms. Chavez' claims for constructive discharge are sufficient to survive summary judgment. The Court therefore **DENIES** the District's motion with respect to those counts.

V. Plaintiff's Claim for Intentional Infliction of Emotional Distress.

In Count III of her Complaint, Ms. Chavez alleges a cause of action for intentional infliction of emotional distress. [*See* Complaint, Doc. No. 18, ¶¶41-46]. As this claim fails as a matter of law, the Court **GRANTS** the District's motion for summary judgment on this claim.

Despite not explicitly recognizing the existence of a common-law cause of action for intentional infliction of emotional distress, the Michigan Supreme Court in *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594 (1985), stated that if the tort exists, it conforms substantially to the principles described in Restatement Torts, 2d, § 46, p.71. "Four elements are identified in

this definition: (1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) 'severe emotional distress.'" *Roberts*, 422 Mich. at 602.

To state a claim for intentional infliction of emotional distress, Ms. Chavez must show that the District intentionally or recklessly engaged in "extreme and outrageous" conduct causing her severe emotional distress. *Duran v. Detroit News, Inc.*, 200 Mich. App. 622, 630 (1993). Extreme and outrageous conduct is conduct that transcends "all possible bounds of decency" and is "utterly intolerable in a civilized community." *Early Detection Ctr., P.C. v. New York Life Ins. Co.*, 157 Mich. App. 618, 625-26 (1986). "This standard is an onerous one, and Michigan Courts have rejected intentional infliction claims even in egregious situations." *Branham v. Thomas M. Cooley Law Sch.*, 2008 WL 5071700, *11 (W.D. Mich. Nov. 24, 2008).

Relying upon *Atkinson v. Farley*, 171 Mich. App. 784, 790-91 (1988), Ms. Chavez argues her intentional infliction of emotional distress claim is sufficient to survive summary judgment:

> In the case at bar, it was Waterford's abuse of the Employer-Employee relationship taken together with the outrageous conduct that gave rise to the intentional infliction of emotional distress. Waterford gave Chavez an inadequate headset microphone that hurt her brain surgery scar. When she complained, she was told that she could not buy her own microphone and should instead tape some padding to it. When Chavez further raised the issue, Dixon went so far as to reach out and touch Chavez's [*sic*] hand, uninvited and without warning - an assault and battery - causing Chavez to jerk away with discomfort.[1] Dixon also constantly came to Chavez's [*sic*] unannounced to watch while Chavez fumbled with inadequate and non-working technology that Waterford provided her as a "reasonable accommodation."

[Pl.'s Br., Doc. No. 32, pp.19-20].

---

[1] In neither her first complaint nor in her amended complaint did Ms. Chavez allege a cause of action for assault and battery.

While the primary authority relied upon by Ms. Chavez - *Atkinson v. Farley* - did hold that "[t]he extreme and outrageous character of the conduct may arise from the position of the actor or a relationship to the distressed party," *Atkinson*, 171 Mich. App. at 790, *Atkinson* did not hold that all "abuses" of the employer-employee relationship amount to a cause of action. The *Atkinson* court elaborated as follows:

> For example, it [extreme and outrageous conduct] *may occur* through an abuse of a relationship which puts the defendant in a position of actual or apparent authority over a plaintiff or gives a defendant power to affect a plaintiff's interest. *Whether a defendant's acts were sufficiently outrageous depends on the context in which the defendant committed them.*

*Id.* (emphasis added). An example of "extreme and outrageous" conduct sufficient to survive summary judgment exists in *Ledsinger v. Burmeister*, 114 Mich. App. 12, 19 (1982), where the defendant used racial epithets while throwing the plaintiff out of his store. Another example can be seen in *Rosenberg v. Rosenberg Bros. Special Acct.*, 134 Mich. App. 342, 352 (1984), where the defendant - brother to the widowed plaintiff's deceased husband, and executor of the husband's estate - engaged in twenty-six instances of "browbeat[ing] her into submission" to sell her late husband's interest in the family business. A final example exists in *Atkinson* itself, where plaintiff's disability insurance carrier repeatedly refused to deal with the plaintiff's attorney, unilaterally reduced his disability payments - the sole source of income for the plaintiff's family - and threatened the plaintiff with demands that he repay large sums of money without justification. *Atkinson*, 171 Mich. App. at 784.

As the Michigan Supreme Court noted in *Roberts*, not all insults and rude conduct amount to a cause of action for intentional infliction of emotional distress:

> The rough edges of our society are still in need of good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be

hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt.

*Roberts*, 42 Mich. at 603. An example of such rude - but not actionable - conduct by an authority figure can be seen in *Cebluski v. City of Belleville*, 156 Mich. App. 190 (1987), where a police officer - despite being informed of the plaintiff's medical condition - refused to allow the plaintiff motorist restroom privileges until the officer had finished processing his ticket:

Plaintiff could not control his bowel movements and had one in his clothing in the presence of the officer and his fiancee. As the officer handed plaintiff a ticket, he stated "That's your problem."

*Cebluski*, 156 Mich. App. at 192.

In a factual scenario analogous to the instant case, the Western District of Michigan dismissed a similar claim for intentional infliction of emotional distress. Like Ms. Chavez, the plaintiff in *Branham v. Thomas M. Cooley Law Sch.*, 2008 WL 5071700 (W.D. Mich. Nov. 24, 2008) was a teacher, and claimed that her being required to teach courses she did not want to teach, her being given an "unnecessary overload of courses[,]" and the school's failure to provide her with reasonable accommodations after discovering that she had epilepsy constituted intentional infliction of emotional distress. *Branham* at *11. The *Branham* court held that "[r]egardless of whether it is nice, wise, or charitable, there is nothing uncivilized or outrageous" about that defendant's conduct. *Id*. After noting that the plaintiff "fails to cite to any Michigan case law where comparable actions have given rise to a tort claim," *Branham* granted summary judgment on the plaintiff's claim. *Id*.

Even taking Ms. Chavez' version of events as true [*See* Pl.'s Br., Doc. No. 32, pp. 19-20], the facts of this case fall short of the standard for intentional infliction of emotional distress

claims.  Ms. Chavez argues that her medical condition - albeit more serious than that of the plaintiff in *Branham* - required her academic employer to make reasonable accommodations to her teaching schedule.  As in *Branham*, Ms. Chavez complained about the *type* of courses she was required by the District to teach, complained about the *amount* of courses she was required to teach, and complained about what she perceived to be the *insufficient reasonable accommodations* made by her employer.  As with *Branham*, here Ms. Chavez "fails to cite to any Michigan case law where comparable actions have given rise to a tort claim[.]" *Id.*

To be sure, Ms. Chavez' allegations - if believed - constitute the type of "inconsiderate and unkind" acts discussed by the Michigan Supreme Court in *Roberts*.  422 Mich. at 603. *Roberts*, however, deemed such mistreatment insufficient to sustain a cause of action for intentional infliction of emotional distress.  For these reasons, the Court **GRANTS** summary judgment in favor of the District on Ms. Chavez' intentional infliction of emotional distress claim [Count III].

CONCLUSION

For the reasons described above, the Court **GRANTS IN PART** the District's motion [Doc. No. 27], **DISMISSES** Ms. Chavez' intentional infliction of emotional distress claim

[Count III], and **DENIES** the remainder of the District's motion.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  June 14, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 14, 2010, by electronic and/or ordinary mail.

s/Jennifer Hernandez
Case Manager